2024 IL App (1st) 232009

SECOND DIVISION
January 29, 2024

No. 1-23-2009B

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 1194101 |
| | ) | |
| REGINA WHITAKER, | ) | Honorable |
| | ) | Anthony John Calabrese, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse concurred in the judgment and opinion.
Justice Ellis specially concurred, with opinion.

## OPINION

¶ 1     Defendant, Regina Whitaker, appeals from the trial court's order granting the State's

verified petition for pretrial detention pursuant to section 110-6.1 of the Code of Criminal

Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2022)).

¶ 2     Defendant was charged with the Class X offense of aggravated vehicular hijacking. 720

ILCS 5.0/18-4-A-4 (West 2022). The charge alleges that on January 8, 2023, on Dempster Avenue

in Skokie, Illinois, defendant, while carrying a firearm, knowingly took a motor vehicle from the

complaining witness by threatening the use of force.

¶ 3    On October 20, 2023, the State filed a verified petition for a pretrial detention hearing. The State asserted that the proof was evident or presumption great that defendant committed the detainable offense of aggravated vehicular hijacking, that defendant posed a real and present threat to the safety of the community, and that no condition or combination of conditions could mitigate that risk.

¶ 4    That same day, the trial court held a detention hearing on the State's verified petition, as well as the petition relating to a co-offender. Before beginning the State's proffer, the trial court asked the Assistant State's Attorney (ASA) to raise his right hand, and the ASA was duly sworn.

¶ 5    The ASA explained that it had tendered arrest reports, incident reports, and reports regarding each of the defendant's criminal background to the defense. The court further noted that there was a "pretrial services public safety assessment" for each defendant in the court file. The trial court asked the attorneys for both defendant and her co-offender if they had those materials, and the attorneys acknowledged receiving them.

¶ 6    The ASA then proceeded by proffer. The ASA averred that on January 8, 2023, at approximately 11:22 a.m., the complaining witness left a store located on Dempster Avenue in Skokie, Illinois. As the complainant walked toward his black Jeep Cherokee, defendant approached and asked him if he had a lighter. The complainant had a lighter in his vehicle and directed defendant and a co-offender toward the vehicle.

¶ 7    The complainant opened his car door and sat in the driver's seat, reaching for the lighter. Defendant brandished a silver revolver with a brown handle and demanded the complainant's keys and phone. The complainant complied and exited the vehicle. Defendant got in the driver's seat, while the co-offender sat in the front passenger seat.

¶ 8     Defendant and her co-offender fled, driving the vehicle westbound. The complainant returned to the store and called 911. When officers arrived, the complainant provided real-time updates of his vehicle's location based on his phone's tracking system. Law enforcement broadcasted this information to surrounding agencies.

¶ 9     Officers at the Lincolnwood police department observed the stolen vehicle traveling on Touhy, and southbound on the Edens Expressway. A red-light camera captured the stolen vehicle near 4100 Foster with Lincolnwood police in pursuit. The Lincolnwood police terminated their pursuit approximately 30 minutes later, after the stolen vehicle disregarded multiple traffic signals and drove at a high speed.

¶ 10     Chicago license-plate readers detected the stolen vehicle's license plate number numerous times, and the Illinois State Police (ISP) then began its pursuit of the stolen vehicle. ISP terminated pursuit of the stolen vehicle, as it was traveling approximately 70 miles per hour and disobeying traffic signals. ISP never lost sight of the vehicle.

¶ 11     Around 12:54 p.m., red light cameras detected the license plate of the stolen vehicle near West Lake Street. Around 1:05 p.m., Chicago police officers recovered the abandoned vehicle on the 5100 block of West Lake Street. Officers retrieved a letter from Crescent Bank and Trust addressed to defendant, which contained her personal information, from the vehicle. The complainant confirmed that the letter was not in his vehicle before the incident.

¶ 12     The stolen vehicle was processed for fingerprints, and defendant's prints were recovered from the steering wheel. The co-offender's fingerprints were recovered from the front dashboard.

¶ 13     Around 1:10 p.m., the victim's phone was retrieved northbound on the Edens Expressway approximately between Church Street and Golf Road. The trajectory of the phone's path was

consistent with defendant's flight path. The co-offender's fingerprints were recovered from the victim's phone.

¶ 14    On February 27, 2023, defendant was arrested for an unrelated incident in which a silver revolver with a brown handle was found on her person. The complainant in this offense positively identified the revolver as the same weapon used by defendant during the January 8, 2023 hijacking.

¶ 15    Continued investigation revealed that both defendant and the co-offender were captured on video surveillance from the Target store located just behind the location of the hijacking. The complainant was able to identify himself in the video, and the two offenders by the clothes they were wearing.

¶ 16    Investigators also learned that defendant and the co-offender regularly communicated with one another on Facebook messenger between December 2022 and June 2023. Detectives learned that defendant was on electronic monitoring, and the co-offender was on probation for an unrelated matter. Detectives contacted their respective agencies and set up a time to arrest both defendants.

¶ 17    On October 19, 2023, the co-offender was given *Miranda* warnings, and the police conducted an interview which was captured on a body-worn camera. The co-offender told police that, on the day of the offense, she had been on a date with defendant. The two women had an argument, and then separated. Defendant then returned with a vehicle that the co-offender knew was not defendant's vehicle. The co-offender entered the vehicle, and both defendants drove toward the west side of Chicago. The co-offender admitted that she was more concerned with not being caught by police than she was about defendant fleeing or crashing the vehicle.

¶ 18    The State informed the court that defendant had pending charges for attempted murder and being a felon in possession of a weapon. Defendant was previously convicted of possession of a controlled substance in 2021 for which she received one year in prison; escape in 2018 for which

4

she received two years' probation; two convictions for possession of a controlled substance in 2016 for which she received two years in prison to be served concurrently; a conviction for possession of a controlled substance in 2012 for which she received six years in prison; a conviction for possession of a controlled substance in 2012 for which she received 18 months' probation; and another conviction for possession of a controlled substance in 2007 for which she also received 18 months' probation.

¶ 19    The court then asked defense counsel for any response. Counsel for defendant stated that he had "reviewed the discovery" provided by the State, and that the complaining witness had initially described the offender as a "male subject in his 20s, and height was five-nine," while defendant is female, 33 years old. and 5'6'. Counsel also stated that the arrest report indicated that the complaining witness could not identify the offender.

¶ 20    Counsel further noted that defendant "did not make any statement," and "as for the document that is inside the Jeep that was found, [defendant] denied that." Counsel "had no idea how that document was there," but asserted that there could be "a number of other explanations" to explain its presence. Finally, counsel asserted that the complainant identified the wrong caliber of gun, a .38 caliber rather than the .22 caliber which was found on defendant upon her arrest.

¶ 21    The court then questioned the parties:

> "Regarding the weapon that was used here, the complaining witness referred to it—
> did he refer to it as a revolver or an automatic at the time that he was talking about
> the weapon? And did he describe the gun in any more detail or in any detail?"

¶ 22    The ASA responded that the victim "describe[d] it as a silver revolver with a brown handle," which was consistent with the firearm recovered from defendant.

¶ 23 The court ordered defendant detained, finding that the proof was evident and the presumption great that defendant committed the offense of aggravated vehicular hijacking, that she posed a real and present threat to the safety of any person, persons, or the community, and that no condition or combination of conditions could mitigate that threat.

¶ 24 The trial court explained that several factors informed its findings. In particular, the court found the incident to be "a brazen armed offense that is alleged to have occurred in the late morning hours [i]n a well-populated area, presenting an extraordinary danger to the community if things were to have gone wrong." The court explained that defendant was armed with, and brandished, a handgun. Additionally, when fleeing, the manner in which defendant drove the vehicle "threatened the community" in her "desire to get away with the proceeds of the crime, including going some 70 miles per hour and disregarding traffic laws." The court found that the evidence showed defendant's "willingness to take any steps necessary to get away with it and to commit [the] offenses as charged here."

¶ 25 Additionally, the court found that there was "extraordinarily strong proof" that defendant committed the offense, specifically noting evidence that defendant's fingerprints were recovered from the wheel of the vehicle, while the co-offender's fingerprints were found on the dashboard, and that defendant's bank document was found inside the vehicle. The court also found that the victim gave a "solid" description of the weapon, making only a "negligible mistake" in its caliber. In addition, the court pointed to co-offender's statement that she was concerned with getting away from the police.

¶ 26 Finally, the court explained that defendant was "already on conditions of release" at the time the offense was committed, and that she had two pending cases—one for possession of a weapon by felon and another for attempted murder.

¶ 27    The same day, the court entered a written order to detain defendant, setting out its findings and reasoning, consistent with its comments in open court.

¶ 28    Defendant filed a timely notice of appeal, from the trial court's order, seeking "to be released from custody on [electronic home monitoring] pending trial." Utilizing the form approved for Rule 604(h) appeals by defendants, defendant's claims of error consisted of two checked boxes. Defendant first checked the box stating that the "State failed to meet its burden of proving by clear and convincing evidence that the proof is evident or the presumption great that defendant committed the offense(s) charged." On the blanks below, defendant elaborated that she "is a 30 year old black female, 5'6"," while the complaining witness "describes a black male, in his 20s, 5'9"." Defendant also wrote that the complaining witness "told the police [that] the offenders were wearing hooded sweatshirts and masks" and that he "didn't believe he could identify them." Defendant further stated that there was "no I.D. of defendant," "no video," and the defendant "made no statement."

¶ 29    Second, defendant checked the box indicating that the "State failed to meet its burden of proving by clear and convincing evidence that defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case." In the space below, defendant expanded that the incident happened in January 2023 and defendant was arrested in October 2023. Defendant alleged that she had "not been charged with any other crime during this time period," that she "poses no threat to the [complaining witness] and the public," and accordingly, that she could "be released on [electronic home monitoring] ."

¶ 30    Defendant did not check the box challenging that the aggravated vehicular hijacking offense charged is not a qualifying offense, nor did she contend that the State failed to meet its

burden, or the court erred in determining, that no condition or combination of conditions could mitigate the safety threat.

¶ 31    The appeal is brought pursuant to Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act (Act). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date of Act as September 18, 2023). This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023).

¶ 32    The Act amended the Code by abolishing traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release. 725 ILCS 5/110-1.5, 110-2(a) (West 2022). For qualifying offenses, upon filing a verified petition requesting denial of pretrial release, the State has the burden to prove by clear and convincing evidence (1) that the proof is evident or the presumption great that the defendant has committed a qualifying offense (725 ILCS 5/110-6.1(e)(1) (West 2022)), (2) that the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community (725 ILCS 5/110-6.1(a)(1)-(7), (e)(2) (West 2022)) or a high likelihood of willful flight to avoid prosecution (725 ILCS 5/110-6.1(a)(8), (e)(3) (West 2022)), and (3) that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or prevent the defendant's willful flight from prosecution (725 ILCS 5/110-6.1(e)(3) (West 2022)).

¶ 33    Pursuant to Illinois Supreme Court Rule 604(h), appeals may be taken from orders granting or denying pretrial release, and the "Notice of Appeal shall describe the relief requested and the grounds for the relief requested." The Rule further provides that the "appellant may file, but is not

required to file, a memorandum not exceeding 4500 words, within 21 days of filing of the Rule 328 supporting record." Ill. Sup. Ct. R. 604(h)(2). The appellee's responsive memorandum is due 21 days later, and this court's decision is due to be filed 14 days thereafter.

¶ 34    In this case, defendant chose not to file a Rule 604(h) memorandum. Instead, defendant filed a "Notice *** in Lieu of Rule 604(h) Memorandum," informing this court of her intention to simply "stand on the notice of appeal" without further analysis or argument presented in a Rule 604(h) memorandum.

¶ 35    This court recognizes that the offices of the State's Attorney, Public Defender, and State Appellate Defender, have been burdened with a large number of these expedited appeals— estimates have suggested that there have been over 1500 such appeals since the effective date of the Act—which have added to their already substantial caseloads. Presumably, the public defender's office has chosen to file notices in lieu of a Rule 604(h) memorandum, like the one filed here, in part as a result of this increased burden.

¶ 36    A significant concern, however, is that the notices of appeal used in these cases are generally form orders with checkboxes providing conclusory claims of error. While there are blanks for further explanation underneath the checkboxes, the appellant does not always utilize that space. And, even when the space is utilized, the form order provides little room for argument or authority to support the claims of error.

¶ 37    While we are sympathetic to the additional burdens that these appeals have imposed on the parties, we use this opportunity to reiterate that an appellant must present sufficient grounds on which this court can review any claims of error. Although Illinois Supreme Court Rule 341 does not govern these proceedings, it is still necessary for an appellant to present " 'coherent argument

9

and analysis supported by proper record citations and legal authorities.' " See *People v. Inman*, 2023 IL App (4th) 230864 (quoting Ill. Sup. Ct. R. 341).

¶ 38    As the court in *Inman* explained,

> "Even the new Rule 604(h) requires the notice of appeal to include a description of the relief to be requested '*and the grounds for the relief requested.*' Ill. S. Ct. R. 604(h)(2) (eff. Sept. 18, 2023). This would appear to mean some form of argument is required, along with justification for claiming entitlement to relief— like references to the record, the evidence presented, or, if possible, legal authority.
>
> ***
>
> [E]ven under the unique circumstances created by the Act, we cannot be expected to formulate an argument for defendant out of whole cloth, and we decline to do so. There is a well-established principle: 'A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' (Internal quotation marks omitted.) *Macias*, 2015 IL App (1st) 132039, ¶ 88. By this we do not mean to say a memorandum as described in Rule 604(h)(2) is required or expected in every case. However, it is reasonable to conclude the Illinois Supreme Court, by approving the notice of appeal form, expects appellants to at least include some rudimentary facts, argument, or support for the conclusory claim they have identified by checking a box. Even without the application of Rule 341, we doubt Rule 604(h) now requires the appellate court to act as an advocate or seek

error on the appellant's behalf—something heretofore expressly forbidden." *Id.*, ¶¶ 12-13.

¶ 39 Even more recently, in *People v. Duckworth*, 2024 IL App (5th) 230911, the Fifth District appellate court granted the State's motion to dismiss the defendant's appeal where the defendant's notice of appeal consisted of only checked boxes, and, on appeal, the defendant filed a notice in lieu of a Rule 604(h) memorandum. *Id.*, at ¶ 2. The appellate court agreed with the defendant's argument that the notice of appeal was sufficient to invoke the appellate court's jurisdiction, but found the defendant's "contention that the defendant is not required to provide any argument supporting his issues on appeal is not well taken." *Id.*, at ¶ 5.

¶ 40 The court explained,

"it is neither this court's burden nor obligation to provide arguments in support of issues raised by an appellant. *** To presume, as contended by [defendant], that this court would present arguments on behalf of the appellant and then issue a ruling on those same arguments is both incredulous and contrary to well-established Illinois Supreme Court rules governing appeals." *Id.*, at ¶ 7.

¶ 41 The court noted that the defendant made only conclusory claims of error, while "refer[ring] to no evidence in the record upon which to evaluate his claims," and "provid[ing] [no] legal argument or authority in support of his claims." *Id.*, at ¶ 8. Moreover, by filing a notice in lieu of a Rule 604(h) memorandum, the defendant's "counsel on appeal, declined [the] opportunity to provide the missing argument, citation of the record, or authority that would support any argument that could have been made for the issues raised on appeal." *Id.* Accordingly, the court granted the State's motion to dismiss, finding "nothing on which to base an analysis of the defendant's allegations on appeal, and the defendant forfeited the issues raised on appeal." *Id.*

¶ 42    In this case, defendant checked two boxes making conclusory claims of error. Defendant provided little additional argument, and failed to provide a single citation to the record or legal authority for either claim. In particular, defendant's arguments that she "poses no threat to the [complaining witness] and the public," and that she could "be released on [electronic home monitoring]," are no more than unsupported conclusory allegations. Although we find the arguments presented by defendant lacking, we decline to dismiss the appeal. Nonetheless, we caution the parties that an appellant risks dismissal where the notice of appeal provides only conclusory claims of error, and the appellant chooses not to avail itself of the opportunity provided to it by Rule 604(h).

¶ 43    Before turning to the merits of defendant's appeal, we note that, due to the recent enactment of the statute, courts have been grappling with many important issues regarding the Act and its application. In particular, there understandably has been significant disagreement in the appellate courts as to which standard of review applies.

¶ 44    Some appellate courts have concluded that all aspects of detention hearings under the Act are subject to abuse of discretion review (see *People v. Whitmore*, 2023 IL App (1st) 231807(B), ¶¶ 18-19; *Inman*, 2023 IL App (4th) 230864, ¶ 11), while others have exclusively utilized the manifest weight standard (see *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12). Other courts have adopted a mixed approach, under which the trial court's determinations that the State has proved by "clear and convincing evidence" that the defendant committed a qualifying offense, and that he is dangerous or a flight risk, is reviewed for the manifest weight of the evidence, while the ultimate decision regarding detention, continued detention, or the imposition of conditions of release are subject to abuse of discretion review. See *People v. Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36; *People v. Hodge*, 2024 IL App (3d) 230543, ¶ 8; *People v. Vingara*, 2023 IL App (5th) 230698,

¶ 10; *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 24, 31 (whether the defendant "committed the charged offense" and whether "he poses a danger to the community," are "factual findings" that are reviewed for the "manifest weight of the evidence. However, "an abuse of discretion standard is most appropriate" to review the determination of whether there "were no conditions of release that could mitigate the safety risk"). Still others have concluded that appeals under the Act should be reviewed *de novo*. See *People v. Battle*, 2023 IL App (1st) 231838, ¶ 18; *Saucedo*, 2024 IL App (1st) 232020 (Ellis, J., specially concurring); *People v. Herrera*, 2023 IL App (1st) 231801, ¶¶ 22-24 (declining to decide what standard of review applies, but suggesting that even under *de novo* review, the case could be resolved based on legal error).

¶ 45 Having reviewed the record of the proceedings, the authority above, and for the additional reasons discussed below, we continue to follow the approach outlined in *Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36, in which we found the appropriate standard of review to be a two-tiered approach.

¶ 46 In general, this court utilizes different standards of review based on the question presented. *LAS, Inc. v. Mini-Tankers, USA, Inc.*, 342 Ill. App. 3d 997, 1001 (2003) (The proper standard of review is "determined by the nature of the question presented to the trial court"). This court reviews pure issues of law *de novo*, granting no deference to the decision of the trial court. *Khan v. BDO Seidman, LLP,* 408 Ill. App. 3d 564, 595 (2011); *In re Estate of Boyar*, 2013 IL 113655, ¶ 27. This standard contemplates that, in answering such legal questions, the trial court is in no better position than the reviewing court. See *Pickel v. Springfield Stallions, Inc.*, 398 Ill. App. 3d 1063, 1066 (2010).

¶ 47    For issues that call upon the factfinder to make factual or evidentiary determinations, a reviewing court will reverse the factfinder only when its decision is against the manifest weight of the evidence. *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001); *Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 356 (1967). This standard recognizes that the trier of fact is in a better position to make these kinds of determinations. *Rodgers v. Withers*, 229 Ill. App. 3d 246, 250 (1992); *Webster*, 195 Ill. 2d at 432 ("The trial court as the trier of fact in a position superior to a court of review, makes determinations based on the evidence and weighs the credibility of participants to the litigation.") (Internal quotations and citations omitted). The idea that the appellate court should give some level of deference to the trial court's findings of fact applies "especially where the testimony is contradictory," because "the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." *Schulenburg*, 37 Ill. 2d at 356. Accordingly, this court should not "overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion." *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008); *Stock*, 2023 IL App (1st) 231753, ¶ 12.

¶ 48    Manifest weight review is used for evidentiary determinations, that require a particular quantum of proof. For example, in civil judgments, the trial court's judgment is only reversed if the verdict was contrary to the manifest weight of the evidence. *McClure v. Owens Corning Fiberglass Corp.*, 188 Ill. 2d 102, 132 (1999).

¶ 49    Specifically, this court has traditionally reviewed cases in which a party bears a burden of proving something by "clear and convincing evidence," using the manifest weight standard. *In re*

14

*C.N.*, 196 Ill. 2d 181, 208 (2001). Clear and convincing evidence is " 'that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question.' " *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. The standard "requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004). For example, in parental rights cases, proof of parental unfitness must be proven by clear and convincing evidence, and, on review, this court considers whether the trial court's finding was against the manifest weight of the evidence. See *C.N.*, 196 Ill. 2d at 208. Likewise, at conditional release hearings under the Sexually Violent Persons Commitment Act (SVPCA), a respondent should be granted conditional release unless the State can prove by clear and convincing evidence that he or she has not made sufficient progress in treatment to be released. 725 ILCS 207/60(d). This finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. See *In re Commitment of Rendon*, 2014 IL App (1st) 123090, ¶ 32; *In re Detention of Erbe*, 344 Ill. App. 3d 350, 372, (2003).

¶ 50 Finally, abuse of discretion review applies in situations requiring the trial court to make a "qualitative rather than a quantitative determination, permitting the court to apply its own knowledge and experience to its determination." *Clay v. County of Cook*, 325 Ill. App. 3d 893, 899 (2001), *as modified on denial of reh'g* (Oct. 23, 2001). In particular, where a circuit court is tasked with balancing "the facts in conjunction with prevailing relevant statutory factors, *** the circuit court is accorded more discretion when making this determination, resulting in an abuse-of-discretion standard of review being more appropriate." *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700 (2006). "An abuse of discretion occurs when the circuit court's decision is arbitrary, fanciful or unreasonable, or where no reasonable person would agree with the position adopted by

the [circuit] court." (Internal citations and quotation marks omitted.) *Reed*, 2023 IL App (1st) 231834, ¶ 31.

¶ 51 Abuse of discretion review is generally used for "decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." *People v. Holman*, 402 Ill. App. 3d 645, 650 (2010). Additionally, criminal sentencing has long been recognized as a subject best left to the sound discretion of the trial court, and the trial court's decision will not be altered upon review absent an abuse of that discretion. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1997) ("the trial court is normally the proper forum in which a suitable sentence is to be determined and the trial judge's decisions in regard to sentencing are entitled to great deference and weight."); *People v. Diestelhorst*, 344 Ill. App. 3d 1172, 1190 (2003). The trial court's imposition of a sentence is given great deference because the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15.

¶ 52 As stated above, the legislature has enacted new legislation, developing a new framework for how pretrial detention hearings are conducted in this state. The prior version of the statute contained no presumption of eligibility for release that must be overcome by the State. The current version of Section 110-6.1, however, contains a presumption of eligibility for pretrial release and requires the State to prove certain elements by clear and convincing evidence to overcome that presumption.

¶ 53 The Act provides a variety of factors that the court may consider in making the necessary determinations (see 725 ILCS 5/110-5(a); 110-6.1(g) (West 2022)), and mandates that decisions regarding release, conditions of release, and detention prior to trial "must be individualized" (725 ILCS 5/110-6.1(f)(7) (West 2022). Additionally, the trial court is required to make a written

16

finding "summarizing the court's reasons for concluding that the defendant should be denied pretrial release." 725 ILCS 5/110-6.1(h) (West 2022). The legislature's directive requiring an individualized determination made by the trial court, based on a variety of factors, and supported by the trial court's reasoning, suggest that it is the trial court, and not this court, that has been entrusted with these decisions in the first instance, and that the appellate court must review the circuit court's reasoning, based on what evidence was before it.

¶ 54    Additionally, the plain language of the Act establishes that detention hearings are evidentiary hearings at which the State bears the burden of showing clear and convincing evidence of certain statutory requirements. The Act explains that the "State or defendant may present *evidence* at the hearing by way of proffer based upon reliable information." 725 ILCS 5/110-6.1(f)(2) (West 2022) (Emphasis added).

¶ 55    We recognize that most hearings under the Act will not be a traditional type of evidentiary hearing, with live testimony in which a witness testifies to his or her personal knowledge. Although the parties are permitted to call witnesses and present evidence, the legislature has recognized that requiring live testimony at such a hearing would be extremely burdensome. As a result, the legislature has directed that "[t]he rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing" (725 ILCS 5/110-6.1(f)(2), (5) (West 2022)), specifically permitting acceptable evidence to include hearsay, and proffers based on reliable information. A proffer "apprise[s] the trial court what the offered evidence is or what the expected testimony will be, by whom it will be presented and its purpose." *People v. Weinke*, 2016 IL App (1st) 141196, ¶ 41 (internal quotations and citation omitted).

¶ 56    Nonetheless, the hearing that occurs is an evidentiary one, in which the prosecutor presents evidence, to meet the State's evidentiary burden, and the defense generally counters with its own

proffer. Notably, the State's petition must be verified pursuant to Section 1-109 of the Code of Civil Procedure, certifying that "the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true." 735 ILCS 5/1-109 (West 2022). A petition which is certified in accordance with this Section "may be used in the same manner and with the same force and effect as though subscribed and sworn to under oath," and any person who knowingly makes a false statement "shall be guilty of a Class 3 felony." *Id*. And in some cases, like presented here, the ASA is actually sworn before making the proffer in open court. This oath is of enormous significance. The ASA is essentially testifying as a witness, and proffering to the court what he or she believes the evidence will show at trial.

¶ 57    Moreover, the evidence that is explicitly permitted by the Act includes hearsay, which may come from the complaining witness, police officers or other witnesses. *People v. Parcel of Prop. Commonly Known as 1945 North 31st St., Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 504 (2005), quoting *Jackson v. Board of Review of the Department of Labor,* 105 Ill.2d 501, 508–09 (1985) (" 'It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect.' "). And that hearsay evidence can be sufficient to meet the State's burden of proof. As this court explained in *Saucedo,* it

> "would be very anomalous to make such specific provisions for witness statements and then find that such statements were insufficient evidence of the defendant's likely commission of the offense charged. *** [B]ased on the plain language of the statute, we believe it was the legislature's intent that such statements would be sufficient proof that it was evident or the presumption great that the defendant committed the charged offense." *Saucedo*, 2024 IL App (1st) 232020, ¶ 40.

¶ 58    Moreover, like here, the court generally will be weighing competing proffers. Defendant is also allowed to present evidence, with the Act further providing that the "defendant shall have the opportunity to testify, to present witnesses on his or her own behalf, and to cross-examine any witnesses that are called by the State." 725 ILCS 5/110-6.1(f)(3) (West 2022).

¶ 59    After receiving evidence from both the State and the defense, the trial court must make a determination as to whether the State has met its burden by "clear and convincing" proof. The evidentiary nature of the hearing conducted by the trial court signals that this court should review the factual determinations of the trial court under the manifest weight of the evidence presented.

¶ 60    Where, as here, the appellate court is called upon to decide whether the State "failed in its burden," of proving a factual matter by clear and convicting evidence, such a determination contemplates a question of proof, and this court must review the weight of the evidence presented. On review, this court examines the record to determine whether it contains facts to support those determinations by clear and convincing evidence.

¶ 61    Specifically, the trial court's first two determinations—whether the defendant committed a detainable offense and whether the defendant poses a threat to a person or the community—are highly intensive factual questions, and they require a certain quantum of evidence, clear and convincing proof, as dictated by the Act. The factors the court may consider in determining whether a defendant poses a threat to the safety of a person or the community are also factual matters. In particular, the statute provides that the trial court *may* consider evidence or testimony regarding, among other things, the "nature and circumstances of any offense charged," the "history and characteristics of the defendant," the "identity of any person or persons to whose safety the defendant is believed to pose a threat, and the nature of the threat," and "[a]ny other factors***deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation

19

for violent, abusive, or assaultive behavior, or lack of such behavior." 725 ILCS 5/110-6.1(g) (West 2022). This language, dictating that a trial court may consider "[a]ny other factors" that is "deem[s] relevant," provides further confirmation that these factual determinations are to be made by the trial court, based on the particular circumstances before it.

¶ 62   Similar to other evidentiary hearings in which a trial court is asked to weigh and resolve conflicts in the evidence presented, this court will review the trial court's factual findings after a detention hearing for the manifest weight of the evidence.

¶ 63   The final proposition the trial court must determine, however, involves a trial judge's reasoning and opinion—the trial court must exercise discretion in determining whether any less restrictive means will mitigate the threat a defendant poses to a person or the community. The statute specifically provides that "[d]ecisions regarding release, conditions of release, and detention prior to trial must be individualized, and no single factor or standard may be used exclusively to order detention." 725 ILCS 5/110-6.1. "Courts are 'endowed with considerable discretion' where, as here, they are called upon to weigh and balance a multitude of factors and arrive at a decision that promotes not only 'principles of fundamental fairness' but 'sensible and effective judicial administration.' [Citation.]" *Reed*, 2023 IL App (1st) 231834, ¶ 31 (concluding that "[o]n the circuit court's determination that there were no conditions of release that could mitigate the safety risk, we agree *** that an abuse of discretion standard is most appropriate.").

¶ 64   In particular, the legislative pronouncement that such decisions be "individualized," fully supports their discretionary nature as well. Similar to aspects in the criminal sentencing context, section 5/110-6.1 requires the trial court to weigh and consider factors, exercising discretion which is individualized to the specific defendant before the court. *People v. Thomas*, 171 Ill. 2d 207, 224–25 (1996) ("the discretionary act of a sentencing court in fashioning a particular sentence

tailored to the needs of society and the defendant, within the available parameters, is a requisite part of every individualized sentencing determination."). We recognize that hearings in the sentencing context and to determine whether a person should be released pursuant to the SVPCA, are not identical to the detention hearings at issue here, however, the standard of review used in those cases is analogous to the one we find appropriate in the detention setting, because of the trial court's review of statutory factors and its obligation to weigh the evidence.

¶ 65    Finally, we observe that some kind of deferential review is appropriate in circumstances like the ones presented here. As stated above, the trial court ensured at the hearing that the parties had received all arrest reports, incident reports, and reports regarding each of the defendant's criminal background. Then, in defendant's notice of appeal, she referred to the arrest report, and contends that it suggests that the complaining witness told police that the offenders were wearing hooded sweatshirts and masks. We note, however, that although the parties and the trial court reviewed and discussed the details of the arrest report, the record on appeal does not contain the arrest report nor does it support any suggestion that the offenders were wearing hooded sweatshirts and masks.

¶ 66    We recognize that, under the current Supreme Court Rules, the obligation of filing the supporting record—including the notice of appeal, the order appealed from, and any supporting documents or matters of record necessary to the appeal—is on the clerk of the circuit court, and not the parties. See Ill. Sup. Ct R. 604(h)(2)(i) (West 2022). However, even presuming that defendant is accurately characterizing the arrest report, its absence illustrates that this court does not have access to the same information that was available to the trial court, demonstrating the necessity of granting some level of deference to the trial court's decision.

¶ 67    Moreover, it is clear that the trial court is in a better position than this court to analyze the statutory factors—whether the defendant committed a qualifying offense, whether a defendant is dangerous or likely to flee, and whether any conditions could mitigate that risk. This court is not in a superior position to weigh the factors and make the required "individualized" decisions, which should be made by the trial court in the first instance.

¶ 68    In sum, this court concludes that the appropriate standard of review for the trial court's first two determinations—whether the defendant committed a detainable offense and whether the defendant poses a threat to a person or the community—is manifest weight of the evidence, while the third determination—whether any less restrictive means will mitigate the safety threat or flight risk posed the a defendant—should be reviewed for an abuse of discretion.

¶ 69    Turning to the merits of defendant's appeal, defendant argues that the State failed to meet its burden of proving by clear and convincing evidence as to the first two of the required factual findings: (1) that the proof is evident or the presumption great that she committed the offense of aggravated vehicular hijacking; and (2) that she poses a real and present threat to any person, persons, or the community. As stated above, we review these findings for the manifest weight of the evidence.

¶ 70    We first address defendant's argument that State failed to show clear and convincing evidence that she committed the offense. Defendant points to her arguments that the complaining witness claimed he could not identify her, and that the description of the offender differed from her own appearance.

¶ 71    As the trial court found, there was "extraordinarily strong proof" that defendant committed the offense. Defendant's fingerprints were found on the steering wheel of the hijacked Jeep, while her co-offender's fingerprints were recovered from the dashboard and from the victim's phone.

Additionally, a piece of mail addressed to defendant and containing her personal information was found in the abandoned vehicle, and the victim confirmed that the document was not in his vehicle prior to the hijacking. Defendant was later arrested in possession of a silver handgun with a brown handle that the complaining witness identified as the gun used in the commission of the vehicular hijacking. The co-offender also gave a videorecorded police interview video, during which she admitted to being in the vehicle with defendant and being involved in a police chase, though she disclaimed her own participation in the hijacking. Finally, the State proffered records that defendant and the co-offender were routinely in communication with one another before and after the offense. In light of the strong evidence set forth above, the argument that defendant may have been misidentified, since she did not match the description of the offender, is not persuasive. In these circumstances, we do not find the trial court's determination that the "proof is evident or presumption great" that defendant committed the offense of aggravated vehicular hijacking to be " unreasonable, arbitrary, *** not based on the evidence presented," or that "the opposite conclusion is clearly evident."

¶ 72    In so holding, we note that our supreme court has repeatedly recognized that a conviction may be sustained, using the beyond a reasonable doubt standard, solely on fingerprint evidence, if the defendant's fingerprints are found in the immediate vicinity of the crime and under such circumstances as to establish that the fingerprint was impressed at the time the crime was committed. See e.g., *People v. Cline*, 2022 IL 126383, ¶ 3; *People v. McDonald*, 168 Ill. 2d 420, 445 (1995), *abrogated in part on other grounds by People v. Clemons*, 2012 IL 107821, ¶ 40; *People v. Campbell*, 146 Ill. 2d 363, 386 (1992); *People v. Rhodes*, 85 Ill. 2d 241, 249 (1981). Accordingly, in this case, where the State must show only that the "proof is evident or presumption

great" that defendant committed the offense, it is clear that the fingerprint evidence alone would be enough to support such a conclusion under this lesser burden.

¶ 73    Defendant next asserts that the State failed to meet its burden of proving by clear and convincing evidence that she poses a real and present threat to any person, persons, or the community.

¶ 74    In determining whether the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, the legislature has set out a number of factors that the court may consider. Those factors include the "nature and circumstances of any offense charged," including whether the offense involves a weapon; the "history and characteristics of the defendant" including "prior criminal history"; whether the defendant "is known to possess or have access to any weapon or weapons"; whether at the time of the current offense, "the defendant was on probation, parole, aftercare release, mandatory supervised release or other release from custody pending trial, sentencing, appeal or completion of sentence for an offense under federal or state law"; and any "other factors *** deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." 725 ILCS 5/110-6.1 (West 2022).

¶ 75    As the trial court explained, the nature and circumstances of the offense were extremely dangerous. The charged crime involved the hijacking of a vehicle in broad daylight in a well-populated area, while defendant was armed with a firearm. Defendant then took the police on a high-speed chase while disregarding multiple traffic signals, showing a blatant disregard for public safety. The history and characteristics of the defendant also suggest her dangerousness—the record establishes that defendant was currently on electronic monitoring at the time of the offense,

and that she had pending charges for attempted murder, and being a felon in possession of a weapon. Additionally, defendant has been known to possess firearms, despite her status as a felon. Finally, defendant has had multiple felony convictions, including a conviction for escape. In light of the statutory factors and the evidence presented in this case, we do not find the trial court's determination that defendant is a safety risk to be "unreasonable, arbitrary, *** not based on the evidence presented," or that "the opposite conclusion is clearly evident."

¶ 76    Defendant, however, specifically contends that the evidence is not sufficient to show she is a safety risk because the incident happened in January of 2023 while she was arrested in October 2023, and she "has not been charged with any other crime during this time period." Defendant, however, presents no authority to support her contention that the absence of additional charges following a crime suggests that she does not pose a danger to a person or the community. If anything, a lack of police contact since a crime could indicate consciousness of guilt and attempts to evade apprehension. Nonetheless, we observe that the record does suggest that defendant was arrested in February 2023, less than two months after the offense at issue, although the record does not reveal the circumstances of that arrest. Based on the record here, we do not find the court's determination on this issue to be against the manifest weight of the evidence.

¶ 77    For the foregoing reasons, we affirm the circuit court of Cook County's order granting the State's verified petition for pretrial detention.

¶ 78    Affirmed.

¶ 79    Ellis, J., specially concurring.

¶ 80    I concur in the judgment, but I respectfully disagree regarding the standard of review. Much of the recent case law has coalesced around a standard of reviewing detention orders for an abuse of discretion. See, *e.g.*, *People v. Whitmore*, 2023 IL App (1st) 231807, ¶ 18; *People v. Bradford*,

2023 IL App (1st) 231785, ¶ 33; *People v. Inman*, 2023 IL App (4th) 230864, ¶¶ 10-11. Some cases have adopted the manifest-weight standard. See, *e.g.*, *People v. Rodriquez*, 2023 IL App (3d) 230450, ¶ 8; *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12.

¶ 81    The majority here adopts a hybrid of both, arguing that a review of the first two findings (sufficiency of proof of crime and whether the accused poses a danger) is under the manifest-weight standard, but the third prong (whether sufficient conditions exist to mitigate the danger) is reviewed for an abuse of discretion. I do not believe that either standard is appropriate, but I particularly disagree with the abuse-of-discretion standard.

¶ 82    I believe that the appropriate standard of review for a detention order should be *de novo*, for several reasons: (1) the abuse-of-discretion standard is inappropriate to a review of factual findings subject to a standard of proof; (2) it is incorrect to state, as some decisions have, that we have historically reviewed detention orders under the abuse-of-discretion standard; (3) findings of fact, though typically reviewed under the manifest-weight standard, are reviewed *de novo* when the court hears no live testimony and makes findings solely on documentary evidence and oral presentation by counsel; (4) *de novo* review is appropriate, in any event, given the gravity of the detention decision and the constitutional right at stake.

¶ 83                                                           I

¶ 84    Before explaining the impropriety of an abuse-of-discretion standard of review, it is important to be clear about what, precisely, we are reviewing in a detention order. In relevant part here, the statute provides that "[a]ll defendants shall be presumed eligible for pretrial release, and the State shall bear the burden of proving by clear and convincing evidence that:

> (1) the proof is evident or the presumption great that the defendant has committed an offense listed in subsection (a), and

(2) *** the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case ***; and

(3) no condition or combination of conditions *** can mitigate (i) the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case ***." 725 ILCS 5/110-6.1(e) (West 2022).

¶ 85    In reviewing these judgments, we are reviewing findings of fact. The burden of proof lies with the State; the standard of proof is clear and convincing evidence. *Id*. That, alone, should put an end to any notion that the three findings made here by the trial court are discretionary in nature, subject to an abuse-of-discretion standard of review, for " '[s]ound discretion' is simply not a standard of proof." *In re D.T.*, 212 Ill. 2d 347, 355 (2004).

¶ 86    "Standards of proof are concerned with the quantum and quality of proof that must be presented in order to prevail on an issue." (Internal quotation marks omitted.) *Id*. Said differently, the standard of proof " ' "instruct[s] the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." ' " *Id*. (quoting *Addington v. Texas,* 441 U.S. 418, 423 (1979), quoting *In re Winship,* 397 U.S. 358, 370 (1970) (Harlan, J., concurring)).

¶ 87    "Sound discretion," on the other hand, "says nothing about the degree of confidence the trial judge must have in the correctness of his or her factual conclusions" and thus "does not identify a standard of proof." *Id*. at 355-56. All of which is to say that if, as here, a statute sets a particular standard of proof of certain facts, it is calling on the court to make a finding of fact: Did

27

the State, or did it not, prove a certain fact by a specified quantum of proof? It does not call for the exercise of the court's discretion.

¶ 88    Nor is there any basis for inferring some sort of discretionary determination laid atop these factual findings. The process begins with the defendant being presumptively eligible for release. 725 ILCS 5/110-6.1(e) (West 2022). If the State fails to carry its burden of proving, by clear and convincing evidence, one or more of these required findings for detention, the court does not retain the "discretion" to detain the defendant, anyway; the presumption of pretrial release stands, and the defendant must be released (with or without conditions). *Id*. To read the statute any other way and judicially implant some freestanding "discretion" over and above the required three findings would be a rewrite of the statute and counter to its obvious purpose.

¶ 89    Simply put, there is nothing discretionary about making a finding as to whether the State has met its standard of proof of a particular fact. And those factual determinations are the only guide to the ultimate outcome—whether the defendant will be retained or released. Because the judgment under review is not "purely discretionary, it makes little sense to *** apply an abuse of discretion standard on review." *People v. Vincent*, 226 Ill. 2d 1, 17 (2007); see also *id.* n.5 ("The abuse of discretion standard is not tied to any quantum of proof.").

¶ 90    Some courts have suggested that the finding of dangerousness is discretionary because subsection (g) of the statute lists multiple factors to be considered in determining dangerousness. See, *e.g.*, *People v. Gibbs*, 2023 IL App (5th) 230700-U, ¶ 5; 725 ILCS 5/110-6.1(g) (West 2022). But the presence of various factors does not convert a finding of fact into a standardless discretionary determination. A multi-faceted question of fact is no more discretionary than a one-dimensional question of fact; it is just more complex.

¶ 91    Our supreme court said as much in *D.T.*, 212 Ill. 2d at 354. The State argued that the best-interests determination was discretionary, in large part because it involved "weighing and balancing" multiple statutory factors in making the best-interests determination for the child. The supreme court rejected this argument, recognizing that fact-finding is not a discretionary exercise. See *id.* at 356. Likewise, in *People v. Crane*, 195 Ill. 2d 42, 49 (2001), the State argued that the standard of review for (constitutional) speedy-trial claims should be abuse of discretion, because the trial court must "balance" the four *Barker* factors (see *Barker v. Wingo*, 407 U.S. 514 (1972)), and in so doing, it necessarily "exercises discretion." *Crane*, 195 Ill. 2d at 49. The supreme court flatly rejected this argument on the ground that the mere balancing of factors does not necessarily raise the trial court's judgment to the level of deference afforded by abuse-of-discretion review. *Id.* at 51-52. To the contrary, "[t]he trial court is in no better position than the reviewing court to balance the competing concerns." *Id.* at 52. The court thus settled on a standard of review where the trial court's findings of fact were subject to manifest-weight review, but "the ultimate determination of whether a defendant's constitutional speedy-trial right has been violated is subject to *de novo* review." *Id.*

¶ 92    Likewise, here, the fact that a trial court may take into consideration many different release conditions, when determining whether sufficient conditions exist to mitigate the accused's threat to safety (or flight risk), does not convert that finding into a discretionary one. The State has the burden of proving by clear and convincing evidence that no combination of such conditions exists; the trial court simply determines whether the State has satisfied that standard of proof. That is not, and never has been, a discretionary exercise.

¶ 93    Because a court's determination of whether the State met its standard of proving a fact does not involve the exercise of discretion, an abuse-of-discretion standard of review is fundamentally incompatible with a statutory scheme that prescribes a standard of proof.

¶ 94                                                    II

¶ 95    The logic of the decisions employing an abuse-of-discretion standard for detention orders proceeds as follows. First, as the court said in *Whitmore*, 2023 IL App (1st) 231807, ¶ 24, "[w]eighing the factors implicated in setting the conditions of pretrial release has always been entrusted to the discretion of the trial judge." Second, because that decision is discretionary, we have always reviewed it for an abuse of discretion. *Id.* ¶ 18. Or as *Inman*, 2023 IL App (4th) 230864, ¶ 10, put it, we have "historically reviewed bail appeals" under that standard. And third, "absent a legislative mandate intended to disrupt this precedent, abuse of discretion remains the proper standard of review." *Whitmore*, 2023 IL App (1st) 231807, ¶ 18, n.1.

¶ 96    First, the legislature cannot dictate to reviewing courts their standard of review. The one time (of which we are aware) that the legislature tried to so dictate, our supreme court struck it down as a separation-of-powers violation. See *People v. Cox*, 82 Ill. 2d 268, 274-76 (1980) (statutory amendment that "modif[ied] the standard of review of sentencing" was "unauthorized legislative intrusion upon the manner in which cases are decided").

¶ 97    In any event, it is time to put to rest the notion that detention orders have historically been reviewed for an abuse of discretion. The genesis of this myth is the failure to distinguish between two things that have long been the subject of legislative distinction: (1) a pretrial *detention* order— that is, the complete denial of any release conditions; and (2) a pretrial *release* order with conditions, the most notable of which was monetary bail (even if the bail was set at an amount the accused could not afford, thus resulting in *de facto* detention). An accused who was "released"

with a "condition" of a posting a high monetary bond that he could not afford was not considered "detained"—he was released with a "condition" he could not satisfy. A *de facto* detention though it may have been, legally that defendant was given the opportunity for release.

¶ 98    Illinois has long made this distinction between the complete denial of release conditions and release on bail and other conditions—at least since 1987, when Illinois amended its pretrial detention and bail statutes, presumably following the lead of federal bail-reform legislation that had recently passed.

¶ 99    There is not a single published decision that has ever discussed the standard of review for *detention orders* under the previous version of the Illinois detention statute. Though many recent cases have cited a 2019 decision, *People v. Simmons*, 2019 IL App (1st) 191253, as proof of this supposed historical fact, that decision did not analyze our previous detention statute; it reviewed the previous version of the statute *governing the setting of bail and other conditions of release*.

¶ 100   Long before the PFA was enacted, the Code of Criminal Procedure already distinguished between release-with-conditions orders and detention orders; it codified this distinction in the statutory division of labor between sections 110-5 (pretrial release conditions) and 110-6.1 (detention) that is still with us today. Before the PFA, section 110-6.1 was entitled "Denial of bail in non-probationable felony offenses," and it first took effect in 1987. See Pub. Act 85-892, § 1 (eff. Nov. 4, 1987). That statutory provision did not look as different from the current version as some decisions would have one believe; in most material respects, it was the same.

¶ 101   For example, to detain an individual—that is, to deny him bail of any amount—the court was required to make the same findings of fact: "The court may deny bail to the defendant where, after the hearing, it is determined that: (1) the proof is evident or the presumption great that the defendant has committed [a qualifying offense]; (2) the defendant poses a real and present threat

to the physical safety of any person or persons ***; and (3) the court finds that no condition or combination of conditions *** can reasonably assure the physical safety of any other person or persons." Ill. Rev. Stat. 1987, ch. 38, ¶ 110-6.1(b).

¶ 102   And while no burden of proof or standard of proof governed prongs (1) or (3), the legislature did assign a burden of proof and standard of proof regarding the defendant's dangerousness: "The facts relied upon by the court to support a finding that the defendant poses a real and present threat to the physical safety of any person or persons shall be supported by *clear and convincing evidence presented by the State*." (Emphasis added.) *Id*. ¶ 110-6.1(c)(2).

¶ 103   This statute, the only provision governing the pretrial detention of an individual, received virtually no attention from the reviewing courts—not one published decision discussing the standard of review. Certainly not *Simmons*, 2019 IL App (1st) 191253, which never so much as mentioned this statute. The only published decision that even addressed the previous version of the detention statute, *People v. Gil*, 2019 IL App (1st) 192419, ¶ 16, held only that the court was required to follow the procedures in the detention statute before holding a defendant without bail. That court had no occasion to review the order itself, much less discuss a standard of review.

¶ 104   What little appellate case law exists on the standard of review for "bail appeals" (*Inman*, 2023 IL App (4th) 230864, ¶ 10) reviewed the previous version of the Illinois statute governing the setting of conditions of pretrial release, including monetary bail. That provision, section 110-5, then as now, was entitled "Determining the amount of bail and conditions of release." Ill. Rev. Stat. 1988, ch. 38, ¶ 110-5; compare 725 ILCS 5/110-5 (West 2022) (current version).

¶ 105   Section 110-5's basic structure was similar to what it is now: it enumerated possible release conditions and set forth a list of considerations that should inform the circuit court's choice of conditions upon granting release. See Ill. Rev. Stat. 1988, ch. 38, ¶ 110-5(a) ("In determining the

amount of monetary bail or conditions of release, if any, which will reasonably assure the appearance of a defendant as required or the safety of any other person or the community and the likelihood of compliance by the defendant with all the conditions of bail, the court shall, on the basis of available information, take into account such matters as" nature of charged crime, alleged use of violence or deadly weapons, any alleged harm to public officials or vulnerable citizens, etc.).

¶ 106    The general restrictions on the amount of monetary bail were that the bond be "(1) Sufficient to assure compliance with the conditions set forth in the bail bond; (2) Not oppressive;" and "(3) Considerate of the financial ability of the accused." *Id*. ¶ 110-5(b). But there was no standard of proof; indeed, the statute did not even place the burden of proof on the State. See generally *id*.

¶ 107    Given the absence of a standard of proof (or even a burden of proof) in the previous version of section 110-5, it is hardly surprising that courts employed an abuse-of-discretion standard when it came to reviewing the setting of bail orders. That was the conclusion in *Simmons*, 2019 IL App (1st) 191253, ¶¶ 12-13, which reviewed section 110-5 (not the detention statute, section 110-6.1) and noted that "appeals of bail orders are exceedingly rare" (*id*. ¶ 1) before concluding that the two previous decisions concerning the setting of bail "at least indirectly reviewed bail or bond rulings for an abuse of discretion." *Id*. ¶ 9. And indeed, *Simmons* was correct that the two previous decisions also concerned the setting of bail, not detention. See *People v. Saunders*, 122 Ill. App. 3d 922, 929 (1984) (court's increase of bond from $200,000 back to its original $500,000 was not error; "no hint of the arbitrariness or caprice which signals judicial abuse of discretion is evident."); *People v. Edwards*, 105 Ill. App. 3d 822, 830 (1982) (it was "not an abuse of discretion" for trial court to continue requiring posting of bond on appeal).

¶ 108   (I would note that the defendant in *Simmons* was held without bail, so it would appear that his detention should have been reviewed under the detention statute, section 110-6.1. That statute, as we held the same year as *Simmons* in *Gil*, 2019 IL App (1st) 192419, ¶ 16, was the statute that must be followed if a defendant was denied bail altogether. But whether *Simmons* was correct is beside the point; the point here is that, right or wrong, *Simmons* reviewed section 110-5, regarding the imposition of bail and other release conditions, not the detention statute.)

¶ 109   The long and short is that no court ever held, under the previous system of pretrial release, that an order detaining a defendant—that is, denying him release under any condition whatsoever, not even a high monetary bail—was reviewed for an abuse of discretion. So to the extent that our appellate decisions have relied on history as a guide, that reliance is misplaced.

¶ 110                                         III

¶ 111   Because the three required findings a court must make before detaining an individual under current law are findings of fact, we would ordinarily review those findings of fact under a manifest-weight-of-the-evidence standard. See, *e.g.*, *People v. Salamon*, 2022 IL 125722, ¶ 75 ("Factual findings by the trial court will be reversed only if they are against the manifest weight of the evidence"); *People v. Sneed*, 2023 IL 127968, ¶ 61 (same); *In re C.N.*, 196 Ill. 2d 181, 208 (2001) (manifest-weight standard applied to State's requirement of proving parental unfitness by clear and convincing evidence). Indeed, some recent decisions have used the manifest-weight standard in reviewing detention decisions. See, *e.g.*, *People v. Rodriquez*, 2023 IL App (3d) 230450, ¶ 8; *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12.

¶ 112   The manifest-weight standard is a deferential one, grounded in the notion that the trial court is in a superior position to determine the weight and credibility of witness testimony, observe witnesses' demeanor, and resolve conflicts in the evidence. *D.F.,* 201 Ill. 2d at 498-99; *People v.*

*Richardson*, 234 Ill. 2d 233, 251 (2009); *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Put differently, the subtleties of a witness's tone, inflection, and body language—which the trial court can see and measure—do not make it to the cold record before the reviewing court. *People v. Radojcic*, 2013 IL 114197, ¶ 34.

¶ 113   But when the parties do not offer live testimony, instead relying on documentary evidence and oral presentation of counsel, the trial court is no longer in a superior position to evaluate the evidence. *Id*. ¶ 34. There is no longer any reason to defer to its findings. *Id*. ¶¶ 32, 35. The supreme court has recognized this principle for over a century; if the circuit court has "no better means of judging the relative candor, fairness, and credibility of the respective witnesses than we have," the parties are "substantially presenting the case to us for a hearing *de novo* upon the same evidence." *State Bank v. Clinton v. Barnett*, 250 Ill. 312, 315 (1911).

¶ 114   And the supreme court has applied this reasoning in many settings, holding that factual determinations, when made solely on documents and oral argument, are reviewed *de novo*. See, *e.g.*, *Cleeton v. SIU Healthcare, Inc.*, 2023 IL 128651, ¶ 26 ("A trial court is entitled to deference in its ruling when converting a respondent in discovery to a defendant only where the court heard testimony and made determinations about conflicting evidence. *** However, where the circuit court only considered documentary evidence (depositions, transcripts, etc.), *de novo* review applies."); *Riso v. Bayer Corporation*, 2020 IL 125020, ¶ 16 ("when, as here, the circuit court determined that plaintiffs met their burden [of making *prima facie* case of personal jurisdiction] based solely on documentary evidence, our review is *de novo*"); *Aspen American Insurance Company v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 12 (same); *Russell v. SNFA*, 2013 IL 113909, ¶ 28 (same); *Radojcic*, 2013 IL 114197, ¶ 34 (*de novo* review of factual findings where "the State offered no live testimony, only transcripts from the grand jury proceedings. Thus, the

trial court did not occupy a position superior to the appellate court or this court in evaluating the evidence offered by the State in support of the crime-fraud exception."); *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007) (factual circumstances surrounding payment of $50,000 to law firm reviewed *de novo*, as "[n]o written agreement accompanied this payment" and "the circuit court did not conduct an evidentiary hearing, nor did the court make any findings of fact. The court apparently relied on the parties' oral argument and the record.").

¶ 115   As our supreme court said in *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009), in determining that the factual findings surrounding an accident involving two boys was subject to *de novo* review:

> "In this case, the trial court heard no live testimony. Both parties acknowledged at oral argument that all testimony was submitted by admitting discovery depositions into evidence. The trial court was not required to gauge the demeanor and credibility of witnesses. [Citation.] Instead, the trial court made factual findings based upon the exact record presented to both the appellate court and to this court. Without having heard live testimony, the trial court was in no superior position than any reviewing court to make findings, and so a more deferential standard of review is not warranted. Thus, although this court has not done so recently, *we reiterate that where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record de novo.*" (Emphasis added.)

¶ 116   At defendant's pretrial detention hearing here, both the State and the parties elected to proffer evidence to the court; there was no live testimony. See 725 ILCS 5/110-6.1(f)(2) (West

2022) (allowing parties to present evidence by proffer). And as far as we have understood the new PFA appeals to date, the vast majority, if not all of them, consist solely of proffers—documents such as police reports and criminal histories and oral presentation by counsel, proffering their best and most persuasive descriptions of the facts of the case. Few, if any, in other words, involved live witness testimony where credibility determinations are at issue.

¶ 117   When, as here, the trial court considers only documentary evidence and oral presentation of counsel, appellate review of those factual findings should be *de novo*, as it traditionally has been, as the reviewing court sits in the same position as the trial judge.

¶ 118                                            IV

¶ 119   There is another reason, independent of those above, why *de novo* review should be the appropriate standard of review for detention orders. Simply put, it is the gravity of the question involved. We cannot lose sight of the fact that a decision to detain an individual, to deprive someone of his or her freedom indefinitely before they have been convicted of anything and remain presumptively innocent, is a momentous one.

¶ 120   A pretrial detention order is fundamentally different from an order that grants release with conditions, no matter how restrictive. Detention is an unconditional deprivation of the accused's "strong interest in [pretrial] liberty." *United States v. Salerno*, 481 U.S. 739, 750 (1987). And while the right to pretrial liberty, and thus release, is not absolute, make no mistake: the "traditional right to freedom before conviction" is a constitutional right, grounded in the constitutional presumption of innocence. *Stack v. Boyle*, 342 U.S. 1, 4 (1951); see *Salerno*, 481 U.S. at 755 ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."); *United States v. O'Brien*, 895 F.2d 810, 814 (1st Cir. 1990) (in determining pretrial release, " '[a]

crucial liberty interest is at stake.' " (quoting *United States v. Delker*, 757 F.2d 1390, 1399 (3d Cir. 1985)).

¶ 121    Among other things, pretrial liberty "permits the unhampered preparation of a defense[] and serves to prevent the infliction of punishment prior to conviction." *Stack*, 342 U.S. at 4. Not to mention that pretrial detention, no different than postconviction incarceration, deprives children of their parents, men and women of their spouses, families of their caregivers and financial support; it abruptly interrupts employment and educational pursuits.

¶ 122    The point here is twofold: (1) the highly deferential abuse-of-discretion standard is inappropriate for a decision of this magnitude; and (2) both our supreme court and the United States Supreme Court have embraced independent *de novo* review in other fact-intensive contexts where the importance of the constitutional rights at stake so warranted.

¶ 123    First, our supreme court has previously rejected the abuse-of-discretion standard when deciding issues of constitutional magnitude. In the decision of *In re D.T.*, 212 Ill. 2d at 356-57, the supreme court reviewed a best-interests determination by the trial court. The best-interests statute contained no standard of proof and presented the trial court with eleven statutory factors to consider in determining the best interests of the child. *Id*. at 354; see 705 ILCS 405/1-3(4.05) (West 2000). The State argued that the absence of a standard of proof, coupled with the list of factors the court had to weigh, meant that the court's best-interests decision was a discretionary one, and thus on appeal the standard of review was abuse of discretion.

¶ 124    Our supreme court, however, refused to view the best-interests determination as one of discretion, because the resulting standard of review—abuse of discretion—was inappropriate for a decision of this magnitude:

> "We also find the State's sound discretion standard difficult to reconcile

with the nature of the trial court's ruling. When a trial court finds that the best interests of the child warrants termination of parental rights and enters an order to that effect, the parent-child relationship is permanently and completely severed. [Citations.] If this ruling is a matter of judicial discretion, as the State and the GAL argue, then it is reviewable only for an abuse of that discretion. [Citation.]

'Abuse of discretion' is the most deferential standard of review—next to no review at all—and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial. [Citation.] For example, a trial judge's decision whether to allow or exclude evidence is reviewed for an abuse of discretion [citation], as is his or her decision to limit discovery [citation], impose a sanction for a discovery violation [citation], disqualify counsel [citation], accept or reject a negotiated plea [citation], and deny a *forum non conveniens* motion [citation]. *** *[A] trial judge's ruling on the ultimate issue at a best-interests hearing—whether the parent-child relationship should be permanently and completely severed—is plainly not the type of ruling to which the highly deferential abuse of discretion review traditionally applies.*" (Emphasis added.) *Id*. at 356-57.

¶ 125   If the important decision on the best interests of a child is "plainly not the type of ruling to which the highly deferential abuse of discretion review traditionally applies" (*id*. at 357), what about the decision to deprive an individual of their freedom for months if not years, while they remain presumptively innocent, awaiting trial? If we do not leave the former decision to the standardless discretion of a trial judge, it is hard to fathom that we would leave the latter decision

to that standardless discretion, either, subject only to "the most deferential standard of review—next to no review at all." *Id.* at 356.

¶ 126   Take another example: In considering fourth amendment suppression questions on the search or seizure of an individual, courts review the findings of historical fact for manifest error but reserve the ultimate question of whether a search or seizure violated the fourth amendment for *de novo* review. See *People v. Oliver*, 236 Ill. 2d 448, 455 (2010); *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006). Among other reasons for employing an ultimate *de novo* review of such fact-intensive questions is the need to provide a uniform body of law concerning the protection of constitutional rights. See *In re G.O.*, 191 Ill. 2d 37, 47 (2000); *Ornelas v. United States*, 517 U.S. 690, 697, 699 (1996).

¶ 127   The analogy is by no means perfect, but consider the incongruity: the question of whether an individual was impermissibly "seized"—that is, detained by the government—for no more than minutes or hours receives ultimate *de novo* review from our courts, but the question of whether someone can be detained by the government for *months or years* while presumed innocent receives no more than abuse-of-discretion review, the most deferential standard known to the law? That cannot be.

¶ 128   These are not novel thoughts. The majority of the federal courts of appeals, with a head start on us, employ *de novo* review of the questions concerning pretrial detention, such as an accused's threat to safety and whether sufficient conditions can mitigate those risks.

¶ 129   In enacting the Bail Reform Act of 1984 (18 U.S.C. § 3141 *et seq.* (1985)), Congress required findings of fact on a defendant's flight risk and threat to the safety of a person or the community, as well as whether sufficient conditions could mitigate those risks, as a prerequisite

to detention. See 18 U.S.C. § 3142(e) (2022). The government must prove defendant's threat to the safety of a person or the community by clear and convincing evidence. *Id*. § 3142(f)(2)(B).

¶ 130 The federal circuit courts of appeals had to immediately grapple with the appropriate standard of review for detention decisions. But not a single one adopted or, for that matter, seriously considered abuse-of-discretion as that standard. The only choice worth discussing was between (1) "independent review," meaning *de novo* review of the ultimate decision to detain, with deference afforded to the trial court's factual findings along the way, like the review of a suppression ruling; and (2) "clear error," the federal-court equivalent of our manifest-weight review. See, *e.g.*, *United States v. Portes*, 786 F.2d 758, 761-63 (7th Cir. 1985); *United States v. Hurtado*, 779 F.2d 1467, 1470-72 (11th Cir. 1985) (collecting circuit precedents).

¶ 131 The majority of the circuit courts of appeals, including the Seventh Circuit, have adopted "independent" or *de novo* review of the ultimate questions regarding detention, with due regard to the trial court's purely factual findings. *Portes*, 786 F.2d at 762 ("We join the majority of the circuits in adopting the so-called 'independent review' standard."); see also *United States v. Maull*, 773 F.2d 1479, 1487 (8th Cir. 1985) ("the clearly erroneous standard should be applied to factual findings made by the district court. *** However, conclusions and reasoning relating to the ultimate questions flowing from such factual considerations—issues such as *** the determination of the conditions that will reasonably assure the appearance of the defendant—should be the subject of independent review."); *United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir. 1985) ("We hold that the applicable standard of review for pretrial detention orders is one of deference to the district court's factual findings, absent a showing that they are clearly erroneous, coupled with our right of independent examination of the facts, the findings, and the record to determine whether an order of pretrial detention may be upheld."); *O'Brien*, 895 F.2d at 814 (" '[a]n

independent determination by the appellate court would seem appropriate in light of the nature of the question to be determined. A crucial liberty interest is at stake.' " (quoting *Delker*, 757 F.2d at 1399)); *United States v. Wilks*, 15 F.4th 842, 847 (7th Cir. 2021) (noting that Seventh Circuit still follows this standard of review, the "majority rule").

¶ 132   In addition to emphasizing the importance of the liberty interest at stake, courts have also noted that, while purely factual determinations such as the credibility of a witness should receive deference, "[i]n a release determination *** the conclusion based on those factual findings presents a mixed question of fact and law. The inquiry transcends the facts presented and requires both the consideration of legal principles and the exercise of sound judgment about the values which underly those principles." *Motamedi,* 767 F.2d at 1405.

¶ 133   Thus, "[i]n reviewing a district court's order denying pretrial release, we must ensure not only that the factual findings support the conclusion reached, but also that the person's constitutional and statutory rights have been respected. [Citations.] Accordingly, we may make an independent examination of the facts, the findings, and the record to determine whether the pretrial detention order is consistent with those constitutional and statutory rights." *Id*.; see *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("We review the district court's factual findings for clear error, but we consider mixed questions of law and fact—including the ultimate question whether detention is warranted—*de novo*."); *United States v. Cisneros*, 328 F.3d 610, 613 (10th Cir. 2003) ("We apply *de novo* review to mixed questions of law and fact concerning the detention or release decision, but we accept the district court's findings of historical fact which support that decision unless they are clearly erroneous.").

¶ 134   These federal circuits thus reserve for *de novo* review the ultimate statutory questions the trial court must answer in deciding whether to detain an individual—such as the finding "that no

condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e) (2022); see *United States v. Maheshwari*, 358 Fed. Appx. 765, 767 (8th Cir. 2010) (independently reviewing and affirming detention of accused based on flight risk); *Maull*, 773 F.2d at 1487.

¶ 135  I am aware of no federal decision that ever seriously considered applying an abuse-of-discretion standard to the critical inquiries regarding detention. See *Hurtado*, 779 F.2d at 1471 (noting that " 'an "abuse of discretion" standard does not make sense' " and " 'only a more rigorous review can provide the kind of protection of both the defendant's liberty interests and the public interest in crime prevention and punishment which Congress felt was necessary in this area.' " (quoting *United States v. Bayko,* 774 F.2d 516, 519-20 (1st Cir.1985)).

¶ 136  We are obviously not bound by federal law, the analogy to the federal bail statutes is not perfect, and not all federal circuits employ this independent review. But an ultimate *de novo* review of the statutory questions presented is appropriate to respect the gravity of the decision to indefinitely detain an individual, and it will allow the reviewing courts to create a body of law to protect an important constitutional right, just as reviewing courts do in decisions governing the protection of fourth and fifth amendment rights.

¶ 137  Independent *de novo* review is thus appropriate in determining the three required findings that (1) the proof is evident and presumption great that the defendant committed the charged offense; (2) the defendant poses a threat to an individual or the community (or is a flight risk); and (3) no set of conditions can mitigate the defendant's threat (or flight risk). 725 ILCS 5/110-6.1(e) (West 2022). While any findings of historical fact would be entitled to deference—should any live testimony be admitted—the ultimate rulings on these three prongs should be subject to independent *de novo* review.

¶ 138    Given that the vast majority of Illinois detention hearings will not include live testimony, anyway, but will be based solely on documents and oral presentations by counsel, *de novo* review would be the proper standard of review, in any event, as discussed above. But in no event should the abuse-of-discretion standard play any role in the review of detention orders.

---

*People v. Whitaker*, 2023 IL App (1st) 232009

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 23 CR 1194101; the Hon. Anthony John Calabrese, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell, Jr., Cook County Public Defender, of Chicago (Abir Ahmed, Assistant Public Defender) for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Amari Dawson, Assistant State's Attorney), for the People. |